IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

JAMES T. CONWAY, III,

    Petitioner,

    v.

MARC C. HOUK, Warden,

    Respondent.

Case No. 2:07-cv-947
JUDGE ALGENON L. MARBLEY
Magistrate Judge Norah McCann King

## OPINION AND ORDER

Petitioner, a prisoner sentenced to death by the State of Ohio, has pending before this

Court a habeas corpus action pursuant to 28 U.S.C. § 2254. This matter is before the Court upon

Petitioner's second motion for discovery (ECF No. 73), Respondent's memorandum in

opposition (ECF No. 74), and Petitioner's reply (ECF No. 75).

This Court's original decision granting Petitioner leave to conduct certain discovery

allowed him to conduct a records deposition of the Columbus Police Department concerning its

homicide investigation of him. (ECF No. 33.) The Court assumed without deciding that such

discovery might produce information relevant to claims six (challenging the refusal of the trial

court to allow defense counsel to introduce a computer simulation reconstructing the shooting);

nine (challenging the refusal of the trial court to instruct the jury on the lesser included offenses

of manslaughter and involuntary manslaughter); ten (challenging the sufficiency of the evidence

supporting the essential element of prior calculation and design for aggravated murder); eleven

(challenging the sufficiency of the evidence supporting the single aggravating circumstance);

fifteen (challenging the effectiveness of defense counsel during all stages of the trial

proceedings); and sixteen (challenging the effectiveness of appellate counsel). As a result of that

discovery, Petitioner sought and received leave to expand the record with more than sixty (60)

documents concerning the Columbus Police Department's homicide investigation. (ECF Nos. 51

and 55.) Respondent opposed opposed none of Petitioner's motions to expand the record, to the

extent that the Court would consider the materials only for the purpose of determining whether

an evidentiary hearing was necessary. (ECF Nos. 43, 48, & 50.) Respondent objected to this Court's consideration of the materials in lieu of an evidentiary hearing.

On May 26, 2011, the Court issued an *Opinion and Order* granting Petitioner's motion for leave to file a second motion for discovery. (ECF No. 72.) In so doing, the Court not only rejected Respondent's suggestion Petitioner's motion was untimely but also declined to invoke in a factual development phase any restrictions on this Court's consideration of new evidence that the United States Supreme Court's recent decision of *Cullen v. Pinholster*, 131 S.Ct. 1388 (2011), might impose.

Petitioner now seeks leave to conduct a second round of discovery in support of the claims of constitutional error set out in his first, fourth, twelfth, thirteenth, fifteenth, and sixteenth grounds for relief. (ECF No. 73, at 3.) Reiterating that Kort Gatterdam replaced Jacob Cairns as co-counsel while this case was pending, Petitioner states that he makes this motion "following Counsel Gatterdam's review of the record and filings in this case, along with further discussions with Counsel Triplett." (*Id.* at 3 n.1.)

The discovery processes contained in the Federal Rules of Civil Procedure do not automatically apply in habeas corpus actions. "A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). In *Harris v. Nelson*, 394 U.S. 286, 295 (1969), the United States Supreme Court held that the "broad discovery provisions" of the Federal Rules of Civil Procedure did not apply in habeas corpus proceedings. As a result of the holding in *Harris*, the Rules Governing Section 2254 Cases In United States District Courts were promulgated in 1976. Specifically, Rule 6(a) provides--

> A party shall be entitled to invoke the processes of discovery available under the Federal Rules of Civil Procedure if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Under this "good cause" standard, a district court should grant leave to conduct discovery in habeas corpus proceedings only "'where specific allegations before the court show reason to

2

believe that the petitioner may, if the facts are more fully developed, be able to demonstrate that

he is ... entitled to relief...."' *Bracy*, 520 U.S. at 908-909 (quoting *Harris*, 394 U.S. at 300). *See*

*also Williams v. Bagley*, 380 F.3d 932, 974 (6th Cir. 2004); *Stanford v. Parker*, 266 F.3d 442, 460

(6th Cir. 2001). In keeping with the well settled principle that habeas petitioners are not entitled

to go on a fishing expedition in search of damaging evidence, this "good cause" standard requires

the petitioner to at least attempt to identify what he expects to uncover through his discovery

requests. *See Williams v. Bagley, supra*, 380 F.3d at 976.

### 1.    Ground One: *Massiah/Henry* Violation

In his petition, Petitioner asserts that the trial court erred when it admitted statements that

Petitioner made to informant Ronald Trent after Petitioner's Sixth Amendment right to counsel

had attached. (Petition, ECF No. 16, at ¶¶ 1-10.) To understand Petitioner's claim and discovery

requests, it is necessary to examine the Ohio Supreme Court's decision rejecting Petitioner's

claim when he raised it on direct appeal. As the Ohio Supreme Court explained:

> The following facts are relevant to the issues raised in propositions 12 and 13. Conway was arrested on February 23, 2002, in connection with the Dockside shooting and was jailed in the same cellblock as Trent. Trent had been in jail for six months before Conway's arrest, and Conway and Trent had not previously known each other. On March 5, 2002, Conway was indicted for the Dockside shooting.
>
> Approximately two weeks after he was arrested, Conway discovered that Trent was a distant cousin. Later, Conway confided to Trent that he was the Dockside shooter. Conway also attempted to enlist Trent to kill a witness to the Dockside shooting and to stage a false confession by coercing someone else to admit on videotape to the Dockside shooting. Conway promised Trent $30,000 for killing a witness and arranged for $5,000 to be deposited in Trent's jail commissary account as an advance payment.
>
> On April 4, 2002, Trent wrote a letter to a prosecutor in the Dockside-shooting case, informing her that he had information regarding Conway's involvement in the shooting. Trent wrote her a second letter, dated April 10, 2002, reiterating that Conway was involved in the Dockside shooting and added that Conway had offered a contract to kill a witness testifying against him.
>
> On April 25, 2002, sheriff's detectives interviewed Trent. During this interview, Trent provided information about the Dockside shooting, Conway's plan to murder a witness, and his intent to manufacture evidence by staging a false confession. Trent and law-enforcement officials also discussed a plan to record Trent's conversations with Conway.

On May 16, 2002, the state placed Trent on work release from jail, and he began working with the Franklin County Sheriff's Office in its investigation of Conway. Between May 17 and May 24, 2002, a series of conversations was recorded in which Trent and Conway talked about Conway's plans to kill a witness and stage a false confession.

Before trial, Conway moved to suppress the evidence collected by Trent. After a hearing, the trial court denied the motion. During the state's case-in-chief, Trent testified on direct examination about his conversations with Conway that occurred both before and after he began working with sheriff's detectives. In addition, the state was permitted to cross-examine Conway about his recorded conversations with Trent after Trent became a confidential informant.

Conway claims in proposition of law 13 that evidence gathered by Trent after he became an informant on May 16, 2002, was introduced during the prosecutor's case-in-chief in violation of the Sixth Amendment.

*State v. Conway*, 108 Ohio St. 3d 214, 224-25 (2006). After setting forth the controlling case law, *Id.* at 225-26, the Ohio Supreme Court continued as follows:

In this case, Conway's Sixth Amendment right to counsel had attached regarding the Dockside-shooting prosecution when he was indicted on March 5, 2002. The state concedes that Trent became an agent for the state on May 16, 2002, and Conway does not argue on appeal that Trent became a government agent before then.

\*    \*    \*

Although the police have a legitimate interest in investigating new or additional crimes, the state's "investigative powers are limited by the Sixth Amendment rights of the accused." *Moulton*, 474 U.S. at 180, 106 S.Ct. 477, 88 L.Ed.2d 481. The right to counsel under the Sixth Amendment is violated when the state's agent engages the accused in conversation designed to uncover incriminating information about the charges pending against him. See *id.* at 177, 106 S.Ct. 477, 88 L.Ed.2d 481. Accordingly, the Sixth Amendment bars the prosecution from using evidence in its case-in-chief that Trent had obtained from Conway after becoming a state agent on May 16, 2002. Because Trent's direct testimony during the state's case presented this evidence, we find that Conway's Sixth Amendment right to counsel was violated.

Nevertheless, our finding does not require an automatic reversal. A constitutional error can be held harmless if we determine that it was harmless beyond a reasonable doubt. *Chapman v. California* (1967), 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705. Whether a Sixth Amendment error was harmless beyond a reasonable doubt is not simply an inquiry into the sufficiency of the remaining evidence. Instead, the question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Id.* at 23, 87 S.Ct. 824, 17 L.Ed.2d 705; *State v. Madrigal* (2000), 87 Ohio St.3d 378, 388, 721 N.E.2d 52. For the following reasons, we conclude that the admission of this evidence during the prosecution's case-in-chief was harmless beyond a reasonable doubt.

First, the evidence erroneously admitted was largely cumulative of evidence that Trent had obtained before becoming a state agent. That is, before May 16, 2002, when Trent agreed with the prosecutor's office to act as a government informant, Conway had already admitted to Trent that he was the Dockside shooter, that he wanted to murder a witness to the Dockside shooting, and that he planned to manufacture evidence for the Dockside case by staging a false, videotaped confession. In addition, by April 9, more than one month before Trent became a state agent, Conway had $5,000 placed in Trent's jail commissary account as a down payment for killing a government witness.

Any statements that Conway made to Trent before Trent became a government informant did not violate Conway's right to counsel and were properly admitted during the state's case. "[T]he Sixth Amendment is not violated whenever–by luck or happenstance–the State obtains incriminating statements from the accused after the right to counsel has attached." *Moulton*, 474 U.S. at 176, 106 S.Ct. 477, 88 L.Ed.2d 481, citing *Henry*, 447 U.S. at 276, 100 S.Ct. 2183, 65 L.Ed.2d 115 (Powell, J., concurring). The record reflects that Conway trusted Trent because they were cousin and that Conway's statements during their joint incarceration were voluntarily made.

The only evidence obtained in violation of Conway's right to counsel that was not uncovered by Trent before he became a state agent involved discussions about Trent's having carried out the plan to make a videotaped confession and kill the person who made the confession. Nonetheless, Conway had already discussed with Trent his plot to kidnap someone who resembled himself, make a video of this person's confession to the Dockside shooting, and then kill that person. In fact, before Trent became a state agent, Conway had instructed Trent on specific details to include in the video. For instance, Conway reminded Trent to include a reference in the video to the live bullet found at the crime scene, which had been ejected when Conway or Myers was making sure that the gun was loaded. Conway also urged Trent to use Randy Price in the video because Price resembled Conway. Thus, although evidence of Conway and Trent's discussions after the videotape had been made and the confessor had purportedly been killed should not have been admitted during the state's case, Conway was not prejudiced, because evidence was properly admitted at trial that Conway had plotted to make the false, videotaped confession with Trent before Trent became an agent.

Second, the question of Conway's guilt is not close in this case. Strong evidence exists, including eyewitness testimony, that Conway retrieved a loaded gun from a car, pursued Williams through the Dockside parking lot, and fired eight shots at his victims–including shots from close range while Williams and Gervais lay defenseless on the ground. Conway also testified during trial that he had shot Williams and Gervais.

Because tainted evidence simply repeated properly admitted evidence and the state's case against Conway was so strong, we hold that the error here was harmless beyond a reasonable doubt. Therefore, we overrule Conway's 13th proposition of law.

In proposition of law 12, Conway contends that his Sixth Amendment right to counsel was violated when the trial court allowed the prosecutor to cross-examine him about the recorded conversations he had with Trent after May 16,

2002.

During cross-examination, Conway first denied telling Trent anything about the Dockside shooting or talking with him about killing a witness. He testified that staging the false confession was Trent's idea. The prosecutor then attempted to impeach Conway by referring to recorded conversations between Trent and Conway that occurred after Trent became a state agent on May 16.

On cross-examination, Conway claimed that his attorneys had not provided him with the Trent tapes before trial, although he did admit to having read through some transcripts of those recorded conversations. The trial court allowed the prosecutor to question Conway outside the presence of the jury in order to give Conway an opportunity to listen to the tapes and to compare them with the transcripts. After that, the prosecutor was allowed to cross-examine Conway about the tape-recorded conversations. Neither the tape recordings nor the transcripts were admitted into evidence.

Conway argues that the trial court committed prejudicial error when it allowed the prosecutor to impeach him by using statements obtained in violation of his Sixth Amendment right to counsel. In *State v. Hill* (1996), 75 Ohio St.3d 195, 661 N.E.2d 1068, we considered whether a defendant's pretrial statements made during a court-ordered psychiatric interview could be used to impeach his trial testimony. Hill claimed on appeal that the statements were inadmissible because his counsel was not present during the psychiatric interview and he was not advised of his *Miranda* rights. We recognized that "an accused's voluntary statement could be used to impeach even when the statement was taken in violation of the right to have counsel present." *Id.* at 207, 661 N.E.2d 1068, citing *Michigan v. Harvey* (1990), 494 U.S. 344, 110 S.Ct. 1176, 108 L.Ed.2d 293.

*Harvey* held that a statement taken in violation of *Michigan v. Jackson* (1986), 475 U.S. 625, 106 S.Ct. 1404, 89 L.Ed.2d 631, while inadmissible during the prosecution's case-in-chief, may be used to impeach a defendant's trial testimony. *Harvey*, 494 U.S. at 349-352, 110 S.Ct. 1176, 108 L.Ed.2d 293. Several federal circuit courts of appeals have, as we did in *Hill*, construed *Harvey* as holding that a voluntary statement taken in violation of the Sixth Amendment right to counsel is admissible for impeachment purposes. *United States v. Ortega* (C.A.9, 2000), 203 F.3d 675, 681; *United States v. Yancey* (C.A.4, 1998), 155 F.3d 564 (unpublished opinion); *United States v. Fellers* (C.A.8, 2005), 397 F.3d 1090, 1097; *United States v. Denetclaw* (C.A.10, 1996), 96 F.3d 454, 457. But, see, *United States v. Spencer* (C.A.2, 1992), 955 F.2d 814 (reading *Harvey* narrowly and holding that statements taken in violation of an accused's Sixth Amendment right to counsel are inadmissible for all purposes, absent a valid waiver); *United States v. Abdi* (C.A.2d, 1998), 142 F.3d 566 (following *Spencer*).

The rationale employed by *Harvey*, and adopted by this Court in *Hill*, is that a defendant should not be allowed to " 'turn the illegal method by which evidence in the Government's possession was obtained to his own advantage, and provide himself with a shield against contradiction of his untruths.' " *Harvey*, 494 U.S. at 351, 110 S.Ct. 1176, 108 L.Ed.2d 293, quoting *Harris v. New York* (1971), 401 U.S. 222, 224, 91 S.Ct. 643, 28 L.Ed.2d 1, quoting *Walder v. United States* (1954), 347 U.S. 62, 65, 74 S.Ct. 354, 98 L.Ed.2d 503. "If a defendant exercises his right to testify on his own behalf, he assumes a reciprocal 'obligation to speak

truthfully and accurately.' " *Id.*, quoting *Harris*, 401 U.S. at 225, 91 S.Ct. 643, 28 L.Ed.2d 1.

On this basis, we hold that Conway's recorded statements to Trent, although obtained in violation of his Sixth Amendment right to counsel, were admissible solely to impeach his untruthful trial testimony. Therefore, we deny proposition of law 12.

*Conway*, 108 Ohio St. 3d at 228-31.

In his second motion for discovery, Petitioner frames his *Massiah/Henry* claim as an argument that the investigating officers employed a jailhouse "snitch" to obtain statements from Petitioner after Petitioner had already been formally charged and accordingly entitled to Fifth and Sixth Amendment protections. (ECF No. 73, at 5.) In support of the claim, Petitioner seeks the deposition of Ronald Trent, the deposition of Detective Zach Scott, and the records deposition of the Columbus Police Department and the Franklin County Sheriff's Office. Petitioner asserts that, if the facts are more fully developed through the discovery he seeks, he will be able to demonstrate that he is entitled to relief by demonstrating that Trent obtained information from Petitioner after Trent became an agent of the State, and that, because Trent had acted as an agent for the state in other cases, he was in fact an agent for the state with respect to Petitioner's case well before May 16, 2002. The latter assertion, Petitioner argues, will also enable Petitioner to confirm that cross-examination of Petitioner using tapes of the conversations between Trent and Petitioner occurred when Trent was already acting as an agent of the state.

Determining whether Petitioner is entitled to conduct discovery on this claim usually begins with identifying the essential elements of this claim. *See Bracy*, 520 U.S. at 904. In *Massiah v. United States*, 377 U.S. 201, 206 (1964), the Supreme Court held that the Sixth Amendment prohibits the government from deliberately eliciting incriminating statements from an accused once the right to counsel has attached. In *United States v. Henry*, 447 U.S. 264, 273 (1980), the Supreme Court held that *Massiah* applied to the use of jailhouse informants. Thus, to establish a Sixth Amendment violation under *Massiah* and *Henry*, the petitioner must demonstrate that the government took some action that was designed to deliberately elicit

incriminating remarks. *See, e.g., Alexander v. Smith*, 311 F. App'x 875, 886-87 (6th Cir. 2009); *Massiah*, 377 U.S. at 72-73; *Henry*, 447 U.S. at 273. To be clear, the petitioner must do more than demonstrate that an informant voluntarily reported incriminating remarks uttered by the petitioner. *See, e.g., Kuhlman v. Wilson*, 477 U.S. 436, 459 (1986); *Alexander*, 311 F. App'x at 887.

The Court cannot find good cause for the discovery that Petitioner seeks. Petitioner's stated reason for seeking the depositions of Ronald Trent and Detective Zach Scott, as well as records depositions of police records, is to establish that Ronald Trent was an agent before the date upon which the trial court and Ohio Supreme Court found that Trent began acting as a government agent: May 16, 2002. Specifically, Petitioner offers the following arguments in support of his discovery requests:

- "It is believed that Trent has previously been used as a snitch for a number of law enforcement agencies." (ECF No. 73, at 6.)

- "If the facts are more fully developed via the above depositions, Petitioner will be able to demonstrate ... that Trent did obtain numerous pieces of information from Conway after [Trent] became an agent of the state...." (ECF No. 73, at 6.)

- "Depositions may also confirm that Trent has acted as an agent previously and thus, the date he became an agent for the State was well before May 16, 2002." (ECF No. 73, at 6-7.)

- "[Depositions] will also confirm that cross-examination of Conway using tapes of conversations between Trent and Conway occurred when Trent was acting as an agent for the State." (ECF No. 73, at 7.)

Fatal to Petitioner's discovery requests and stated reasons for discovery is the utter lack of an evidentiary basis for Petitioner's now-stated belief that Trent was acting as an agent before May 16, 2002. Having reviewed Petitioner's arguments on direct appeal and in postconviction, the habeas corpus petition in this case, and the Court's two previous decisions granting Rule 7 expansion of the record (ECF Nos. 51 and 55), the Court can find no basis supporting Petitioner's current contention that Trent was acting as a government agent before May 16, 2002. That leaves only the above statements to support that contention and they fall woefully short of providing any basis beyond speculation that Trent was acting as an agent before May 16, 2002. Without anything but Petitioner's unsupported belief to support the proposition that Trent was acting as an agent before May 16, 2002, Petitioner's discovery requests smack of the very fishing expedition that Rule 6 forbids.

As for Petitioner's assertion that the discovery he seeks may enable him to demonstrate that Trent obtained numerous pieces of information from Petitioner after Trent became an agent, the Court can discern no logical connection between the discovery Petitioner seeks and what Petitioner intends to demonstrate. Stated simply, the record is what it is. The information that Trent obtained from Petitioner on a particular date is established in the record. Nothing that Trent or Detective Scott could testify to in a deposition could establish otherwise. Similarly, nothing from the discovery Petitioner thus currently seeks could undermine the Ohio Supreme Court's determination that most of the post-May 16, 2002 information (improper) about which Trent testified during the prosecution's case-in-chief was cumulative to pre-May 16, 2002 information about which Trent testified (proper).

Further, as to Petitioner's last point, even assuming that Trent was acting as an agent before May 16, 2002, or that every piece of information that Trent pried from Petitioner was in violation of Petitioner's Sixth Amendment rights, those facts would not undermine the Ohio Supreme Court's determination that it was not error for the prosecution to use that information to impeach Petitioner on cross-examination. The Ohio Supreme Court's determination in that

9

regard was a legal determination, based solely on interpretation of case law, not a factual one. That being so, no amount of factual development, and certainly not the factual development that Petitioner proposes, would demonstrate that Petitioner is entitled to relief on that component of his *Massiah/Henry* claim.

## 2. Ground Four: Trial Court's Curtailing of Cross-Examination

In his fourth ground for relief, Petitioner argues that the trial court improperly curtailed defense counsel's cross-examination of a prosecution witness regarding a perjured affidavit attributed to the witness. Petitioner explains that, during the pretrial hearing on Petitioner's motion to suppress his statements, a former assistant prosecutor, Timothy Braun, testified that confidential informant and state's witness, Ronald Trent, had once falsely confessed to a crime that he had not commited and even signed an affidavit to that effect. At trial, the trial court prohibited Petitioner from either cross-examining Trent about the details underlying the crime to which he had falsely confessed or to call Braun to testify about Trent's actions in that regard. Specifically, the trial court allowed Petitioner to establish only that Trent had lied in a prior affidavit. Petitioner complains that the trial court's curtailment of Petitioner's cross-examination was prejudicial because it prevented him from presenting to the jury essential information demonstrating Trent's lack of credibility and history of lying under oath.

In support of this claim, Petitioner seeks to depose Trent, trial attorneys Robert Suhr and Brian Rigg, and Braun. Petitioner reasons that defense counsel could explain not only the basis for their desire to probe into the details of the offense to which Trent falsely confessed but also the manner in which further questioning would have demonstrated Trent's character of untruthfulness. Petitioner asserts that he needs to depose Trent in order to obtain specific information about the affidavit that Trent signed, the facts underlying the offense to which Trent falsely confessed, and the reason(s) why he lied. Finally, Petitioner states that a deposition of Braun will produce valuable information about Trent's credibility, as well as establish a link between Trent and the Franklin County Prosecutor's Office.

10

Respondent begins by arguing that Petitioner did not fairly present his claim to the state courts and pointing out that this Court has already recognized as much. (ECF No. 74, at 5-6 (citing *Opinion and Order*, ECF No. 29, at 34).) Respondent continues by arguing that the information that Petitioner seeks from Trent, such as Trent's perjured affidavit, is already in the record and/or is irrelevant, such as the reason(s) why Trent lied. (ECF No. 74, at 6.) Respondent also argues that Petitioner should not be permitted to develop now facts that he could have developed earlier. Finally, Respondent argues that it is not necessary to depose Petitioner's trial attorneys about their reasons for wanting to probe further into Trent's perjured affidavit, emphasizing that the parties made extensive arguments on the record at trial concerning this very matter.

In his reply, Petitioner takes issue with Respondent's argument that the trial court satisfied the Sixth Amendment when it permitted defense counsel to ask Trent whether he lied. (ECF No. 75, at 6-9.) Petitioner insists that further questioning beyond what the record already contains is critical to impeaching Trent's credibility. Petitioner likewise asserts that, although defense counsel made arguments to the trial court in support of their intent to probe further into Trent's perjured affidavit, further inquiry is necessary to determine how much counsel knew about Trent's actions. Dismissing as speculation Respondent's suggestion that deposing Braun is unnecessary because the legal basis of the claim will ultimately fail, Petitioner argues that the deposition of Braun is necessary because Braun has important information about Trent's credibility and because the trial court limited Braun's pretrial testimony.

Petitioner has not demonstrated good cause for the discovery he seeks to conduct in support of his fourth ground for relief. His claim is almost surely waived. Beyond that, it is manifest from the record that the information that Petitioner seeks to develop is either established, cumulative, irrelevant–or all of the above.

In its March 31, 2009 *Opinion and Order*, the Court held that Petitioner had failed to fairly present his fourth ground for relief to the state courts. (ECF No. 29, at 30-35.) The Court

11

declined at that time to dismiss the claim as waived, indicating that it would, out of an abundance of caution, entertain in its final decision any good faith cause and prejudice arguments, such as a colorable claim of ineffective assistance of appellate counsel. (*Id*. at 35.) Petitioner suggests in his reply that the Court's announced intention to consider cause and prejudice arguments in its final decision relieved him of any obligation to make those arguments herein. He is mistaken. Any attempt to demonstrate good cause for discovery on an arguably waived claim is doomed to fail by the omission of arguments suggesting that cause and prejudice exists to excuse the waiver. That is reason enough to find that Petitioner failed to satisfy Rule 6's good cause requirement.

Beyond that, however, Petitioner falls short of establishing good cause because the information that he seeks to develop is either already established in the record, cumulative to what is in the record, or simply irrelevant. Information that Petitioner seeks to obtain from Braun is irrelevant to Petitioner's claim. Evidentiary rules prohibit Braun from testifying as to his opinion of Trent's credibility and the only facts upon which Braun could elaborate–such as the discrepancies between what Trent related to Braun about the offense and the information that Braun knew about the offense–are not relevant to the issue of Trent's veracity.

Most of the information that Petitioner seeks to obtain from Petitioner's defense attorneys already appears in the record. Contrary to Petitioner's assertion, the arguments that Petitioner's defense counsel made in attempting to persuade the the trial court to allow them to question Trent more extensively about his perjured affidavit demonstrate that they already had substantial information about the details underlying the offense to which Trent falsely confessed, Trent's reasons for falsely confessing, and the circumstances surrounding Trent's relationship with the man who was eventually convicted of the crime. (Tr. Vol. 11, at 1884-93.)

Finally, information that Petitioner seeks from Trent would not further in any meaningful way the substance of Petitioner's claim. Because Petitioner's defense counsel thoroughly explored on the record Trent's prior record, time spent in prison, desire to avoid more time in prison, and lies under oath when he signed a false affidavit, the Court finds unpersuasive any

argument that further inquiry by defense counsel into the details underlying Trent's false confession would have made a difference to the jury's determination of Trent's credibility. Said another way, even assuming that Petitioner could establish through a deposition of Trent, every fact that he posits in his discovery motion, that information would not further Petitioner's fourth ground for relief. *See, e.g., Dorsey v. Parke*, 872 F.2d 163, 167 (6th Cir. 1989) (explaining that where the accused's cross-examination is limited, the pivotal inquiry is whether the jury had enough information despite the limits to assess the defense theory). That being so, Petitioner has not shown good cause for the discovery he seeks to conduct on his fourth ground for relief.

### 3. Ground Twelve: Jury Tainted by Outside Influence

Petitioner argues in his twelfth ground for relief that the jury in his case was contaminated by an outside influence–namely an improper conversation between a sitting juror (Ms. Guisinger) and the first alternate juror (Ms. Benedetti). (Petition, ECF No. 16, at ¶¶ 99-107.) Prior to the commencement of the mitigation phase, the trial court questioned both, outside the presence of the other jurors and each other. The trial court ultimately excused Ms. Benedetti, over her objection, and kept Ms. Guisinger, over defense counsel's objection and motion for a mistrial. According to the petition, the improper conversation concerned the two discussing the guilty verdicts that the jury had just returned, with Ms. Benedetti saying, "I could never do what you just did." Both women admitted the conversation but denied initiating it. And Ms. Benedetti additionally admitted that the alternate jurors had engaged in discussions about how they would have voted, even knowing that the trial court had explicitly instructed them not to do so.

In his motion for discovery, Petitioner elaborates on his argument, asserting that when the trial court questioned the sitting juror and the alternate jurors about whether inappropriate discussions had occurred, "[t]he answers the court received were conflicting." (ECF No. 73, at 9.) Petitioner additionally complains that "[t]he trial court asked all the jurors if they had been exposed to media coverage between the trial and penalty phases, but did not inquire about inappropriate discussions." (*Id.* at 9-10.) Petitioner emphasizes that this was so despite the fact

13

that the alternate juror who was excused indicated that there was a day when five jurors were talking about the case. (*Id.* at 10.) Recognizing that juror testimony cannot be used to impeach a verdict, Petitioner asserts that "when a potential meritorious claim of extraneous influence is raised, the court must conduct a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954), to give the defendant an opportunity to show bias." (*Id.* at 10-11 (citing *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999)).) To that end, Petitioner seeks to depose the sitting and alternate jurors from his trial. As he explains:

> Petitioner will question the jurors regarding the improper contact and any impact it may have had. Petitioner will not delve into the deliberative process, and will restrict himself to questions regarding the improper contact and any impact it may have had. The discovery Petitioner requests is specific, limited, and reasonably calculated to lead to evidence in support of his claim that his trial attorneys performed unreasonably and to his prejudice. A court in the Northern District has allowed the deposition of all jurors in a similar circumstance.

(ECF No. 73, at 11.)

Respondent raises a host of reasons why Petitioner is not entitled to the discovery he seeks. First, according to Respondent, the record already contains testimony from the sitting jurors and alternate jurors concerning this issue. (ECF No. 74, at 10.) Second, Respondent asserts that Petitioner's stated reason for seeking discovery is based on the belief--refuted by the record, Respondent argues--that the trial court failed to inquire about inappropriate conversations. Third, Respondent argues that any testimony by the jurors would be inadmissible because it would constitute new evidence that the Ohio Supreme Court did not consider and because Ohio Evid. R. 606(b) prohibits admission of the juror testimony to impeach an otherwise valid verdict. Fourth, according to Respondent, Petitioner's request is overly broad. Finally, Respondent asserts that Petitioner could have made this request in his original discovery motion, "filed over 700 days ago." (ECF No. 74, at 16.)

In order to determine whether petitioner is entitled to conduct discovery on this claim, the Court initially must identify the essential elements of this claim. *See Bracy*, 520 U.S. at 904. A criminal defendant tried by a jury of his peers has a constitutional right to a fair and impartial

14

jury. U.S. CONST. AMEND VI; *Duncan v. Louisiana*, 391 U.S. 145 (1968). Thus, a defendant's rights are violated when a jury's verdict is affected by prejudicial extraneous facts that are not part of the evidence introduced at trial. *See, e.g., Smith v. Phillips*, 455 U.S. 209 (1982). Regarding the trial court's responsibility when faced with a possibility of extraneous influences on the jury, the Court of Appeals for the Sixth Circuit has held:

> Clearly established Supreme Court precedent dictates that "[w]hen a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information actually was on that jury." *Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999), *overruled on other grounds by Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000); *cf. United States v. Rigsby*, 45 F.3d 120, 124-25 (6th Cir. 1995)("When there is a credible allegation of extraneous influences, the court must investigate sufficiently to assure itself that constitutional rights of the criminal defendant have not been violated."); *United States v. Shackelford*, 777 F.2d 1141, 1145 (6th Cir. 1985)("A trial court's refusal to permit an evidentiary hearing may constitute abuse of discretion when the alleged jury misconduct involves extrinsic influences.").***.

*Williams*, 380 F.3d at 945.

The trial record on the juror misconduct was thoroughly developed and that fact closes the door on Petitioner's discovery request. Petitioner has not demonstrated good cause for the expansive discovery that he seeks in support of his juror misconduct claim because he fails to offer any factual basis for believing that additional juror misconduct occurred or that any of the sitting or alternate jurors were biased against Petitioner because of the misconduct that occurred. Petitioner insists in his reply that discovery is warranted because the record is not complete on this matter. (ECF No. 75, at 9-10.) The Court disagrees.

Prior to the commencement of the mitigation phase, Juror Guisinger at some point informed court personnel about a conversation that had occurred the previous week, following the jury's guilty verdicts, when she was driving some other jurors home. (Tr. Vol. 16, at 2696-97.) Out of the presence of the jurors, the trial court advised counsel of the matter and then had Guisinger brought into the court room. She explained that she had driven three jurors home and, when she was alone in her car with alternate juror Benedetti, Benedetti remarked, "I could never

do what you just did." (*Id*. at 2698.) Guisinger stated that she replied, "oh, yes, you could," to which Benedetti responded, "that man looks no worse than the rest of them." (*Id*.) Guisinger stated that, at that point, she changed the subject. Guisinger stated that there had not been any such conversations up to that point, denied that it would affect her ability to proceed with the mitigation phase and asserted that it would not influence her opinion to the extent that she could not be fair and impartial. (*Id*. at 2698-99.) Neither the prosecution nor defense counsel availed themselves of the opportunity to question Guisinger, and neither objected to her continuing to serve on the jury. (*Id*. at 2699, 2701.)

After Guisinger had exited the court room, the trial court stated:

> The next question is, obviously, Mrs. Benedetti, who directly violated the admonition of the Court, which has been clear to everybody on this jury, the admonition has been given several times and the Court tried every time we recessed to remind them of the admonition. My feeling is that it's a direct violation. I don't see how she can – she should be able to continue since she displayed a willingness to violate it and waited till two jurors got out of the car to do it, like she was going to have a private conversation. So – I mean, just between her, Mrs. Guisinger and her. That's the Court's feeling.

(*Id*. at 2701-02.) Although the prosecution and defense counsel were in general agreement with the Court's assessment and inclination to excuse Benedetti, defense counsel expressed additional concerns that a juror who would be willing to violate the admonition "would do things watch – read the newspaper, watch TV, if she's will to go that step f[u]rther and talk to other jurors about their deliberations." (*Id*. at 2702.) Defense counsel accordingly not only acquiesced in the trial court's discharge of Benedetti, but also asked that each juror be questioned whether they had been exposed to any media coverage and whether they had engaged in or been exposed to conversations with other jurors or anybody else about the case. (*Id*. at 2703-04.)

The trial court then had Benedetti brought into the court room and the following exchange took place:

> THE COURT:    I brought you out to talk to you about something that – it has been reported that maybe you might have had [a] conversation with one of the other jurors with respect to this case, one of the 12 members of the panel, regular members on Friday night –

ALTERNATE JUROR BENEDETTI:   Not me.

THE COURT:   – when you were taken home.

ALTERNATE JUROR BENEDETTI:   Not me.

THE COURT:   And maybe expressed an opinion at least.

ALTERNATE JUROR BENEDETTI:   The person that you're talking about took me home, but she talked about it to me, not me to her.

THE COURT:   She reported that you had expressed your views about the case to her.

ALTERNATE JUROR BENEDETTI:   No, I didn't.

THE COURT:   Or your view about the case.

ALTERNATE JUROR BENEDETTI:   No, I didn't.

THE COURT:   Counsel want to – well, what was it she told you?

ALTERNATE JUROR BENEDETTI:   She said, things went really well today.  She said, we had to see all the evidence, and it just brings it more home to you when you have to make a decision like we did, and she said, I feel like we really did a good job.  That's it.

THE COURT:   Is that it?  You didn't give her any opinion?

ALTERNATE JUROR BENEDETTI:   No.

THE COURT:   Say anything?

ALTERNATE JUROR BENEDETTI:   No.

THE COURT:   Okay.

Mr. Lowe, do you have any questions?

MR. LOWE:   One second.

(Assistant Prosecuting Attorneys conferring off the record.)

MR. LOWE:   When this conversation took place, who was with you?

ALTERNATE JUROR BENEDETTI:   Just she and I.

THE COURT:   Ms. Guisinger?

ALTERNATE JUROR BENEDETTI:   I don't know her name.

THE COURT:   Okay.

MR. LOWE:    Where did this conversation take place?

ALTERNATE JUROR BENEDETTI:    In a car, her car.  She took me home.

MR. LOWE:    All right.  And you didn't express any opinion at all?

ALTERNATE JUROR BENEDETTI:    No.

MR. LOWE:    Nothing, Your Honor.

MR. RIGG:    Any other conversations that you remember other than what you just told us?

ALTERNATE JUROR BENEDETTI:    Just idle talk.

THE COURT:    Just?

MR. RIGG:    Just what?

ALTERNATE JUROR BENEDETTI:    Idle talk, you know, she's taking me home.

THE COURT:    Not about the case?

ALTERNATE JUROR BENEDETTI:    No.

MR. RIGG:    Any other conversations –

ALTERNATE JUROR BENEDETTI:    No.

MR. RIGG:    – with any of the other jurors present, do you remember, about the case?

ALTERNATE JUROR BENEDETTI:    Not with the four of us, no.

MR. RIGG:    Thank you.

ALTERNATE JUROR BENEDETTI:    Um-hmm.

THE COURT:    Have you ever had any other conversations with any of the jurors about the case, discussing the merits of the case or anything about the case?  Do you understand the admonition of the Court?

ALTERNATE JUROR BENEDETTI:    Sure.  When we were in, the alternates were in here, we sort of skimmed over certain things, but we never made a definite decision about anything, all we did was just kind of skim over what was going on.  That we did.

THE COURT:    You mean you talked about the evidence in the case?

ALTERNATE JUROR BENEDETTI:    No.  We like – let's see.  I asked

18

them if they were to vote today –

THE COURT:    If what?

ALTERNATE JUROR BENEDETTI:    If they were to vote today, how would they find this man?

THE COURT:    You asked them that?

ALTERNATE JUROR BENEDETTI:    Yes, and they asked me.

THE COURT:    Did you not understand the admonition?

ALTERNATE JUROR BENEDETTI:    Yes, I did.

THE COURT:    But you did have that conversation –

ALTERNATE JUROR BENEDETTI:    Right.

THE COURT:    – anyway?

ALTERNATE JUROR BENEDETTI:    With the two alternates.

THE COURT:    All right.  Did you elicit from them how they would have voted on issues?

ALTERNATE JUROR BENEDETTI:    Yes, I did, and they told me.

MR. LOWE:    I don't have any more questions, Your Honor.

THE COURT:    Mr. Rigg?

MR. RIGG:    What was their comment, do you remember?

ALTERNATE JUROR BENEDETTI:    Guilty.

MR. RIGG:    Okay.  All of – the other two jurors, I guess?

ALTERNATE JUROR BENEDETTI:    (Nods head) And I said I would not have voted that way.

MR. SUHR:    So I guess what you're saying is all the alternates essentially violated the Judge's rule?

THE COURT:    She said she asked them.

ALTERNATE JUROR BENEDETTI:    I did.

THE COURT:    She said she initiated conversations with the others.

ALTERNATE JUROR BENEDETTI:    Well, actually, Judge, the conversation started before I said my, what I thought, if you understand what I

mean. We were kind of talking back and forth before, and then I went to wash my hands and I came back and I asked that question.

THE COURT:     Counsel, do you have anything?

MR. LOWE:     Well, Judge, I think we need to talk for a minute.

MR. RIGG:     I agree.

THE COURT:     Please do not discuss anything we've just discussed right now.

ALTERNATE JUROR BENEDETTI:     I won't.

THE COURT:     Not one word.

ALTERNATE JUROR BENEDETTI:     Okay.

THE COURT:     That is an order of the Court.

ALTERNATE JUROR BENEDETTI:     Yes, sir.

(Tr. Vol. 16, at 2706-11.)

The trial court then brought in the other two alternates, one at a time. Alternate Juror Burkhart answered, when asked whether she recalled anything about the conversation that Benedetti described, "Not really, because, you know, we were told when we were in there that we could not discuss the case, and we didn't understand why we couldn't talk about it." (*Id.* at 2713.) Burkhart denied that they had discussed the weight of the evidence or how each of them would have voted on the issues in the case. (*Id.*) Burkhart also denied that any conduct of the jurors violated the trial court's admonition or would affect her ability to be a fair and impartial juror. (*Id.* at 2714.) When questioned by the prosecution, Burkhart reiterated that at no time did another alternate juror, or anyone else, ask her to express her opinion on the case or how she would vote. (*Id.* at 2714-15.) She also denied hearing any other alternates have any such conversation. (*Id.* at 2715.) In response to questioning by defense counsel, Burkhart clarified that, when she stated that the alternates had discussed "a few little things" about the case, she was referring to the fact that the alternates did not understand why they had been sequestered but could not deliberate or discuss the case. (*Id.*) Finally, Burkhart confirmed for the trial court that

20

she had not read, heard, or seen any news coverage about the case, even after her husband remarked that the case was in the news, having surmised what case Burkhart was serving on. (*Id.* at 2716-17.)

After Burkhart returned to the jury room, Alternate Juror Ishmael was brought into the court room. The trial court explained that they were looking into reports that there may have been conversations among the alternate jurors when they were sequestered, that the first alternate may have asked the other alternates how they would have voted on the verdicts and may have expressed her opinion as well. (*Id.* at 2718-19.) When asked what she recalled about any such conversation, Ishmael answered, "There was not any discussion about the case. She did ask us that, but there was no discussion as far as anything that went on, any evidence or anything else." (*Id.* at 2719.) When asked whether she expressed her own opinion, Ishmael answered that she could not remember. (*Id.*) When asked whether anyone reminded the others that they really were not supposed to be having any such discussion, Ishmael answered, "I think we just kind of left it at that, and there was no more discussion." (*Id.*) Ishmael said that she did not remember whether the first alternate (Benedetti) had verbally expressed her opinion on how she would have voted. (*Id.* at 2719-20.) She agreed that the alternates had questioned why they could not at least hear the deliberations of the sitting jurors or deliberate among themselves while sequestered, but stated again that "we did not do that." (*Id.* at 2720.) Ishmael confirmed that she was aware that the trial court had instructed them not to discuss the case and that they accordingly did not. (*Id.*) When asked again whether she remembered how she responded to Benedetti's question, Ishmael answered, "No, I really don't, and I don't believe, you know, either of the others said either way. But she did ask the question, and I think we just kind of ignored it." (*Id.*) Finally, Ishmael confirmed for the trial court that nothing about the incident would affect her ability to be a fair and impartial juror in the case or influence her views on any of the issues. (*Id.* at 2720-21.)

In response to questioning by the prosecution, Ishmael denied that she had ever initiated

such conversations about the case, confirmed that she could not remember expressing her opinion on how she would have voted, agreed that she could not recall anyone else expressing their opinion about how they would have voted, and stated that she could not recall any other conversations among the alternates about the case. (*Id.* at 2721-22.) Defense counsel asked Ishmael whether, if no one had verbally expressed their opinions, anyone had demonstrated a "physical reaction" indicating their opinions. (*Id.* at 2722.) Ishmael answered:

> Just that it would have – you would have to take a lot into consideration. We felt like the jury that was suppressed – that was in deliberations were really, really taking their time and going through all the evidence and everything, we did discuss that, made the three of us, as hard as it was to sit in that room all day, we really felt like they were doing a very good job and taking everything very slowly and going over everything very good, so that was – made us all feel good, even though it was hard to sit in there and wait all day.

(*Id.* at 2722-23.) Finally, in response to questioning by the trial court, Ishmael denied that she had read, heard, or seen any news coverage about the case or had anyone recount any news coverage to her. (*Id.* at 2723-24.)

The trial court dismissed Ishmael back to the jury room and recalled Juror Guisinger to the court room. Guisinger reiterated that it was Benedetti who had initiated the conversation in Guisinger's car, not the other way around, "because I didn't want to talk about it and I was totally shocked that she said that, and after it was said, I quickly changed the subject. And I would never initiate that." (*Id.* at 2725.) The trial court gave the prosecution and defense counsel an opportunity to inquire further; both declined. (*Id.*) Finally, Guisinger denied that she had read, heard, or seen any news coverage about the case or had anyone recount any news coverage to her. (*Id.* at 2725-26.)

The trial court then dismissed Guisinger back to the jury room and recalled Benedetti. Despite Benedetti's insistence that it was not she who had initiated the conversation with Juror Guisinger, the trial court reminded Benedetti that she had admitted to soliciting votes from the other alternate jurors and then announced that, "[o]ut of an abundance of caution, we're going to ask that you not serve on the case from now on." (*Id.* at 2727.) Benedetti then remarked, "[w]e

had a day in there, Judge, when five people were talking about it." (*Id.* at 2728.) Benedetti asked why she was being singled out. The trial court stuck by its decision to remove Benedetti and then excused her with the thanks of the court. (*Id.* at 2728-29.)

Defense counsel moved "for a mistrial on all the jurors, especially with juror number 8, Ms. Guisinger." (*Id.* at 2729.) Defense counsel also opined that the remaining alternate jurors could continue to serve. (*Id.* at 2729-30.) With respect to Guisinger, defense counsel explained that, regardless of who had initiated the conversation in her car, enough evidence existed to suggest that she, too, had violated the court's admonition by discussing deliberations at all. (*Id.* at 2730.) Defense counsel also emphasized evidence suggesting that Guisinger, in response to Benedetti's remark that she could never do what the jurors had just done, *i.e.,* return guilty verdicts, replied, "oh yes you could." (*Id.* at 2730-31.)

The trial court overruled defense counsel's motion for a mistrial, explaining that the trial court's admonition not to discuss the case is not violated by "technical violations(s)" that do not involve the substance of the case or otherwise affect the jurors' impartiality. (*Id.* at 2731.) The trial court recited three reasons for its decision to keep Guisinger: (1) the fact that any opinion that Guisinger may have voiced to Benedetti was merely an indication of her vote as part of how all twelve jurors voted; (2) the trial court's credibility determination that it was Benedetti, not Guisinger, who had initiated the conversation and that Guisinger was truthful when questioned about the incident; and (3) the fact that the content of the conversation was not prejudicial to Petitioner, and was arguably favorable to Petitioner. (*Id.* at 2732.) With respect to the decision to keep the remaining alternate jurors, the trial court explained that one alternate had no recollection of expressing an opinion on the verdicts and the other insisted that she had not expressed an opinion, as well as the fact that neither seemed unduly affected by the conversation. (*Id.* at 2733.) When defense counsel argued that Guisinger, in response to Benedetti's remark, should have said nothing at all, the trial court reiterated its explanation that there was no prejudice to Petitioner because Guisinger appeared only to have "expressed a view of some

23

assurance in her verdict." (*Id.* at 2735.) The trial court proceeded to state, with respect to keeping the remaining sitting jurors and not declaring a mistrial, that:

> [A]ll of them have said they have not been affected by it and the Court's going to take that at their word. We've had an opportunity to ask them. I don't know what else we can ask them about it. But I don't think that we have any clear error, prejudicial situation in any way, particularly in the way of the test of a mistrial, which is a fair and impartial juror cannot – jury trial cannot proceed at this point. There's just not that evidence. The Court will overrule the motion, we will proceed.

(*Id.*)

The trial court then had each juror–save for Guisinger and alternates Burkhart and Ishmael–brought in to ask whether any juror had been exposed to news coverage about the case. (*Id.* at 2735-36.) After defense counsel asked the first juror brought in about any conversations about the case the juror may have had or been exposed to, which conversations the juror denied (*Id.* at 2736), the trial court proceeded to ask each remaining juror whether he or she had been exposed to any news coverage and whether he or she had engaged in or been exposed to any conversations about the case. (*Id.* at 2737-48.)

Turning to Petitioner's arguments, to extent that the trial court focused on whether any jurors had been exposed to news coverage of the trial, it bears reminding that that focus was a function of defense counsel's insistence. (Tr. Vol. 16, at 2702-03.) Further, Petitioner's assertion that the sitting jurors were not questioned about whether they had engaged in or been exposed to improper discussions about the case outside of deliberations is flatly belied by the record. (ECF No. 75, at 10.) As noted above, after overruling defense counsel's motion for a mistrial, the trial court announced its intention to bring in each sitting juror, one at a time, to inquire whether anyone had been exposed to media coverage of Petitioner's trial. Juror Schierholt was the first and, after the trial court inquired whether Schierholt had been exposed to any media coverage, defense counsel asked whether Schierholt had talked to any jurors outside deliberations about the case; Schierholt answered, "No." (Tr. Vol. 16, at 2736.) Thereafter, the trial court asked each sitting juror not only whether he or she had been exposed to any news

24

coverage but also whether he or she had engaged in discussions with any other jurors apart from proper deliberations about the case. (*Id*. at 2737-48.) Each sitting juror denied any such discussion. (*Id*.) If the trial court's questioning was not as extensive as Petitioner would now prefer, it bears reminding that the record contains no indication or suggestion–beyond alternate juror Benedetti's vague statement in passing (and in defense of her own misconduct) that "five people were talking about it" (*Id*. at 2728)–that any such improper conversations took place among or between the sitting jurors. The record reflects only the possibility that improper conversations took place among or between the alternate jurors while they were sequestered together and away from the sitting jurors. And that issue–including the varying descriptions recounted by alternates Benedetti, Burkhart, and Ishmael–was thoroughly explored by the trial court. Thus, there appears on the record no need for the trial court to have questioned the sitting jurors more extensively than the court actually did. In view of the foregoing, Petitioner has demonstrated no need now to depose the sitting or alternate jurors. The record reflects no cogent evidence of improper conduct on the part of the sitting jurors, and therefore no risk of bias. The record also reflects that any improper conduct on the part of alternate juror Benedetti resulted in no prejudice to the sitting jurors or alternate jurors or indeed Petitioner.

### 4. Grounds Thirteen and Fifteen: Ineffective Assistance/Denial of Counsel of Choice.

In his thirteenth ground for relief, Petitioner charges that the trial court erred in precluding Petitioner from retaining new counsel to represent him in the penalty phase of his capital trial. (Petition, ECF No. 16, at ¶¶ 108-115.) Petitioner's counsel to that point, according to Petitioner, had conducted an unreasonable mitigation investigation. Petitioner asserts in his fifteenth ground for relief that his defense counsel were ineffective for failing to conduct reasonable trial phase investigation, failing to retain necessary experts for the trial counsel, conducting an unreasonable mitigation phase investigation, failing to retain necessary mitigation experts, and performing unreasonably during the mitigation phase. (*Id*. at 121-163.) As Petitioner reiterates in his discovery motion, "there were things he asked counsel to do in the trial

phase, which they did not do." (ECF No. 73, at 12.) Specifically, according to Petitioner:

- [T]here is a claim related to what trial phase interviews were conducted. (R.16, Petition, ¶124).

- [T]here are claims regarding defense counsel's preparation for cross-examination of key state's witness Ronald Trent. (R.16, Petition, ¶¶125-26).

- There is a claim regarding counsel's failure to call Gary Hall as a defense witness regarding further information on Trent. (R.16, Petition, ¶127).

- There is further a claim that David Baker should have been called as a defense witness but was not. (R.16, Petition, ¶128).

- There is a claim that the videotape from the Dockside Dolls parking lot cameras should have been presented at trial. (R.16, Petition, ¶129).

- There are several claims in the Fifteenth Ground for Relief involving trial phase experts [an expert in ballistics and firearms and an expert in optometry and/or opthalmalogy] that were not retained or consulted by the defense. (R.16, Petition, ¶¶131-35).

- There are ineffectiveness claims related to the voir dire and selection of jurors. (R.16, Petition, ¶¶ 136-41).

Finally, with respect to his claim that defense counsel conducted an unreasonable mitigation investigation, failed to retain necessary mitigation experts, and performed unreasonably in the mitigation phase, Petitioner points out "how no experts were called in the penalty phase, and how the entire mitigation presentation consisted of the defense calling Conway's mother and father as the only witnesses and Conway giving an unsworn statement." (ECF No. 73, at 13.)

In order to determine whether petitioner is entitled to conduct discovery on these claims, the Court must identify the essential elements of this claim. *Bracy*, 520 U.S. at 904. Regarding petitioner's ineffective assistance of counsel claim, the right to counsel guaranteed by the Sixth Amendment is the right to the effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). The standard for reviewing a claim of ineffective assistance of counsel is twofold:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not

functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984). With respect to the first prong of the *Strickland* test, the Court notes that, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.

To establish the second prong of the *Strickland* test, *i.e.*, prejudice, a petitioner must demonstrate that there is a reasonable probability that, but for counsel's errors, the result of the proceedings would have been different. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Because Petitioner must satisfy both prongs of the *Strickland* test to demonstrate ineffective assistance of counsel, should the Court determine that Petitioner has failed to satisfy one prong, it need not consider the other. *Id.* at 697.

In support of the counsel ineffectiveness claimed in grounds thirteen and fifteen, Petitioner seeks to depose his defense attorneys, Robert W. Suhr and Brian J. Rigg, as well as defense counsel's mitigation specialist, Jim Crates. Petitioner reasons that "depositions of trial counsel will allow this Court to determine whether there exists a tactical reason for any omission or action, and, if so, whether the tactical basis offered by trial counsel was reasonable." (ECF No. 73, at 15.) Further, according to Petitioner, a deposition of the mitigation specialist will document the extent of the mitigation investigation and what direction, if any, trial counsel provided in that regard. The crux of Petitioner's request is that the best, if not only, source of evidence related to the decisions that trial counsel made about mitigation investigation and strategy are trial counsel and their mitigation specialist. (*Id.* at 14.)

The Court is of the view that there are more factors militating in favor of allowing Petitioner's discovery than against it. The allegations set forth in Petitioner's ineffective assistance claims are properly before the Court and are neither patently frivolous nor palpably

27

incredible. The discovery that Petitioner requests is specific, limited, and reasonably calculated to lead to evidence in support of his various claims that his trial attorneys performed deficiently and to his prejudice through certain acts and omissions. Also militating in favor of discovery is the fact that claims of ineffective assistance, and especially mitigation-phase ineffectiveness, are of particular importance in capital habeas corpus cases, as evidenced by the number of cases in which the Sixth Circuit has addressed such claims in detail. *Foust v. Houk*, No. 08-4100, 2011 WL 3715155 (6th Cir. Aug. 25, 2011) (granting relief on claim of mitigation-phase ineffective assistance of counsel); *Morales v. Mitchell*, 507 F.3d 916, 929-36 (6th Cir. 2007) (same); *Williams v. Anderson*, 460 F.3d 789, 801-05 (6th Cir. 2006) (same); *Dickerson v. Bagley*, 453 F.3d 690, 696-700 (6th Cir. 2006) (same). Petitioner is correct in pointing out that, under clearly established federal law, this Court is tasked with conducting an objective review of counsel's performance–including actions and omissions–measuring the reasonableness thereof through a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time. (ECF No. 75, at 10-11 (quoting *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); and *Strickland*, 466 U.S. 668).) To this point, it is usually the case that information about what strategy defense attorneys formulated and what investigation was conducted to arrive at and implement that strategy is uniquely in possession of those defense attorneys and that is usually sufficient to establish good cause to depose trial counsel about their actions and omissions. *Cf. Walker v. Ayers*, No. C 94-1997, 2008 WL 4449569, at *4 (N.D. Cal. Sep. 30, 2008) ("Because trial strategy is an issue in ineffective assistance of counsel claims, petitioner has good cause to depose his former attorneys on, *inter alia*, their trial tactics and strategy.").

Respondent's myriad arguments in opposition are insufficient to persuade this Court that good cause does not exist for Petitioner to depose his trial attorneys and mitigation specialist. First, Respondent takes issue with Petitioner's characterization of the issue, insisting that the inquiry before the Court is not whether trial counsel performed unreasonably and to Petitioner's prejudice, but whether the state courts' decisions finding otherwise contravened or unreasonably

applied clearly established federal law. (ECF No. 74, at 17.) The fact that that is the precise inquiry before the Court does not obviate the value to the Court's task of gathering information about counsel's decision making process.

Respondent also reiterates his argument that the United States Supreme Court's *Pinholster* decision precludes consideration of new evidence that the state courts did not consider. (*Id.* at 18.) The Court explained in its May 26, 2011 *Opinion and Order* allowing Petitioner to file a second motion for discovery that it would not invoke in the discovery phase any restrictions imposed by *Pinholster*. (ECF No. 72.) The Court declines to do so now. Allowing discovery of evidence that this Court ultimately may be prohibited from considering may not seem like the most efficient approach. But the *Pinholster* decision is relatively new and federal courts are still sorting through its potential ramifications and limitations. Against that backdrop, it seems advisable to err on the side of caution, gather information early, and decide later whether or to what extent the information may be considered.

Respondent also urges this Court to deny Petitioner's discovery request on the basis that Petitioner failed to exercise due diligence in the state courts because he never requested to depose his trial attorneys or mitigation specialist. (ECF No. 74, at 18-19.) That argument is unpersuasive for several reasons. First, strictly speaking, Habeas Corpus Rule 6 and the cases interpreting that rule contain only a "good cause" requirement, not a due diligence requirement. The fact that a motion to expand the record pursuant to Rule 7 or a motion for an evidentiary hearing pursuant to Rule 8 contains a due diligence requirement is not relevant to the determination now of whether Petitioner has demonstrated good cause to conduct discovery. That said, the record does not support Respondent's claim that Petitioner failed to exercise due diligence. Petitioner presented these allegations to the state courts in his Ohio Rev. Code § 2953.21 postconviction action. Each claim in that action, as well as the prayer for relief, included a general request for permission to conduct discovery. Further, the exhibits that Petitioner did submit in support of his postconviction claims–such as a police interview of

Ronald Trent, an affidavit of and related materials from a firearms/ballistics expert, and numerous affidavits and other materials documenting Petitioner's background and providing cultural information–refute a determination that Petitioner was dilatory in developing the factual basis of his claim in the state courts.

Finally, Respondent asserts that "the record already includes certain information Conway seeks." (ECF No. 74, at 19.) Respondent is partially correct but this does not undermine Petitioner's demonstration of good cause. Prior to the commencement of the mitigation phase, trial counsel provided summary explanations not only for why they had declined to introduce surveillance video tapes from the murder scene or to call certain witnesses, but also as to difficulties they were experiencing getting Petitioner's family to cooperate with them and preparing Petitioner to make his unsworn statement. (Tr. Vol. 16, at 2749-75.) That record evidence falls considerably short of accomplishing what depositions could accomplish–namely, revealing information about what strategy defense attorneys Brian Rigg and Robert Suhr formulated and what investigation was conducted to arrive at and implement that strategy is uniquely in possession of those defense attorneys and that is usually sufficient to establish good cause to depose trial counsel about their actions and omissions. *See Walker*, 2008 WL 4449569, at *4.

Along those lines, there is good cause to believe that there may be an additional source of information relating to counsel's investigation and preparation for Petitioner's mitigation phase–namely, the defense team's mitigation specialist, Jim Crates. It is almost surely the case that the mitigation specialist retained and consulted by defense counsel in the period leading up to Petitioner's trial constitutes a valuable source of information concerning defense counsel's investigation, preparation, and impressions in formulating and implementing their mitigation strategy.

For the foregoing reasons, Petitioner has demonstrated good cause in support of his thirteenth and fifteenth grounds for relief to conduct depositions of trial attorneys Brian J. Rigg

and Robert W. Suhr, as well as of mitigation specialist Jim Crates.

### 5. Ground Sixteen: Ineffective Assistance of Appellate Counsel.

Finally, Petitioner's sixteenth ground for relief asserts claims of ineffective assistance of appellate counsel. Specifically, Petitioner argues in his petition that his appellate attorneys performed unreasonably and to his prejudice when they failed to raise propositions of law alleging instances of ineffective assistance of counsel and an instance of prosecutorial misconduct for failure to provide complete discovery. (Petition, ECF No. 16, at ¶¶ 164-171.) Petitioner faults appellate counsel for failing to raise the following instances of trial counsel ineffectiveness: failure to object to prejudicial questioning by the State of Ronald Trent, referencing Petitioner's other capital trial; failure to go forward with the motion to suppress, instead submitting the transcript of the suppression hearing from Petitioner's other capital trial; failure to present testimony from the firearms expert to dispute the State's assertion that .45 caliber ammunition has penetrating ability and to explain why .45 caliber handguns so readily discharge; failure to present testimony about a computer simulation of the offense—specifically failing to give proper notice of the expert's report, failing to proffer the expert's qualifications, and failing to proffer the substance of the expert's testimony—failure to excuse a death-prone juror during voir dire; and failure to object to an allegedly infirm instruction concerning the element of intent on the course-of-conduct charge. Petitioner also argues that appellate counsel should have raised a proposition of law challenging the State's failure to provide complete discovery, specifically Ronald Trent's May 26, 2002 statement to police.

In support of these claims, Petitioner seeks to depose his appellate attorneys, Todd W. Barstow and David J. Graeff. (ECF No. 73, at 17.) Petitioner explains in his reply that it is necessary to pose "questions related to why certain issues were not raised, whether a tactical or winnowing decision or whether other reasons exist, such as not recognizing the issue or not having a correct understanding of the law regarding a particular issue." (ECF No. 75, at 15.) Respondent opposes discovery on Petitioner's sixteenth ground for relief for the same reasons

31

that Respondent opposes discovery on the trial counsel ineffectiveness claims set forth in Petitioner's thirteenth and fifteenth grounds for relief. (ECF No. 74, at 16-20.)

Although the nexus between Petitioner's request to depose his appellate attorneys and what information he anticipates will bolster his appellate counsel ineffectiveness claim is more tenuous than was the case with respect to Petitioner's thirteenth and fifteenth grounds for relief, the Court nonetheless finds good cause for the discovery that Petitioner requests. Petitioner's discovery requests are largely calculated to expose credibility issues with the prosecution's key witness, jailhouse informant Ronald Trent. The damaging nature of testimony provided by Ronald Trent persuades this Court that there is good cause to believe that deposing Petitioner's appellate attorneys could lead to relevant information supporting Petitioner's sixteenth ground for relief.

With respect to the essential elements of Petitioner's claim, the *Strickland* test applies to appellate counsel. *Burger v. Kemp*, 483 U.S. 776 (1987). Counsel must provide reasonable professional judgment in presenting the appeal. *Evitts v. Lucey*, 469 U.S. 387, 396-97 (1985). "'[W]innowing out weaker arguments on appeal and focusing on' those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quoting *Jones v. Barnes*, 463 U.S. 745, 751-52 (1983)). *But see Smith v. Anderson*, 104 F. Supp. 2d 773, 839 (S.D. Ohio 2000) ("This Court believes that, in capital cases, appellate counsel should approach the traditional process of winnowing out claims with extreme caution."); *Jamison v. Collins*, 100 F. Supp. 2d 647, 740-41 (S.D. Ohio 2000) ("[W]e believe that any 'winnowing' or narrowing of issues must be done very cautiously when a person's life is at stake.").

Of course, not every decision made by appellate counsel can be insulated from review merely by categorizing it as strategic. The Court of Appeals for the Sixth Circuit has identified the following considerations that ought to be taken into account in determining whether counsel on direct appeal performed reasonably competently:

A.  Were the omitted issues "significant and obvious?"

B.  Was there arguably contrary authority on the omitted issues?

C.  Were the omitted issues clearly stronger than those presented?

D.  Were the omitted issues objected to at trial?

E.  Were the trial court's rulings subject to deference on appeal?

F.  Did appellate counsel testify in a collateral proceeding as to his appeal strategy and, if so, were the justifications reasonable?

G.  What was appellate counsel's level of experience and expertise?

H.  Did the petitioner and appellate counsel meet and go over possible issues?

I.  Is there evidence that counsel reviewed all the facts?

J.  Were the omitted issues dealt with in other assignments of error?

K.  Was the decision to omit an issue an unreasonable one which only an incompetent attorney would adopt?

*Mapes v. Coyle*, 171 F.3d 408, 427-28 (6th Cir. 1999). The Sixth Circuit cautioned, however, that this list is not exhaustive and need not produce a certain "score." *Id.* at 428.

Petitioner argues that his appellate counsel performed deficiently and to his prejudice by failing to raise on appeal a claim challenging certain instances of trial counsel ineffectiveness and an instance of prosecutorial misconduct. The Court is satisfied that there is good cause for Petitioner to depose his appellate attorneys. There is a sufficient factual and legal foundation to question appellate counsel's failure to raise these issues on direct appeal and only they can provide explanations concerning the issues they chose to raise, the issues they elected to omit and the reasons for that omission, as well as other *Mapes* factors, such as whether appellate counsel met with Petitioner to discuss which issues to raise and whether appellate counsel had a sufficient command of the facts and the law. The discovery that Petitioner requests is specific, limited, and reasonably calculated to lead to evidence in support of his claim that his appellate counsel performed deficiently and to his prejudice. In short, although the State's case against

33

Petitioner was strong, Ronald Trent's testimony was particularly incriminating.

For the foregoing reasons, Petitioner has demonstrated good cause, in support of his sixteenth ground for relief, to conduct depositions of his appellate attorneys Todd W. Barstow and David J. Graeff, to the extent set forth above.

## V.  CONCLUSION

Petitioner's motion for leave to conduct discovery is **GRANTED** to the extent described above.  Although the Court finds that discovery is warranted as described above, the Court will not permit prolonged, unlimited discovery.  Because the discovery requests granted by this Court will consist of only five depositions, Petitioner will have three (3) months from the date of this *Opinion and Order* to complete this discovery.

For the foregoing reasons, Petitioner's second motion for discovery (ECF No. 73) is **GRANTED** in part and **DENIED** in part consistent with the foregoing.

**IT IS SO ORDERED.**

ALGENON L. MARBLEY
**United States District Judge**